BENJAMIN IRON & STEEL CO. v. UNITED STATES (No. 411).[1]

OLD STEEL RAILS NOT SCRAP.

To bring old steel rails within the provisions of paragraph 118, tariff act of 1909, the burden is on the importer to show that the importation is not only of scrap steel, but that it is such scrap steel as to constitute "waste or refuse iron or steel fit only to be remanufactured by melting." The evidence in the record falls short of showing the shipment was of this character; it was properly held dutiable under paragraph 126, tariff act of 1909.

United States Court of Customs Appeals, May 31, 1911.

APPEAL from Board of United States General Appraisers, Abstract 23664 (T. D. 30768)

[Affirmed.]

*Shire & Jellinek* (*Vernon Cole* of counsel) for appellant.

. *D. Frank Lloyd*, Assistant Attorney General (*Thomas J. Doherty* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

SMITH, Judge, delivered the opinion of the court:

The Benjamin Iron & Steel Co. imported at the port of Buffalo, N. Y., 25 carloads of steel rails purchased in Canada from the Provincial Steel Co. The importation was classified by the collector as steel rails and assessed for duty under paragraph 126 of the tariff act of August 5, 1909, which reads as follows:

126. Railway bars made of iron or steel, and railway bars made in part of steel, T rails and punched iron or steel flat rails, seven-fortieths of one cent per pound; railway fish-plates or splice-bars, made of iron or steel, three-tenths of one cent per pound.

The importer objected to the classification and duty assessed and claimed in his protest duly filed that the wares were scrap steel rails fit only for remanufacture by melting, and therefore dutiable under paragraph 118 of the act, which reads as follows:

118. Iron in pigs, iron kentledge, spiegeleisen, and ferro-manganese, two dollars and. fifty cents per ton; wrought and cast scrap iron, and scrap steel, one dollar per ton; but nothing shall be deemed scrap iron or scrap steel except waste or refuse iron or steel fit only to be remanufactured by melting, and excluding pig iron in all forms.

The Board of General Appraisers overruled the protest and the importers appealed.

Only one question is raised by the appeal and that is: Are the steel rails scrap steel; that is to say, waste or refuse steel fit only to be remanufactured by melting?

On the hearing before the board the importer and three witnesses gave testimony in support of the protest. Giving to their testimony all the weight to which it is justly entitled it establishes at most that the importation is one of old steel rails which are so broken, worn, and damaged as to be unfit not only for the uses for which they were

---

originally manufactured, but also for the secondary purpose and less exigent needs of contractors' or industrial railways. Steel rails in such a condition, even if it be accepted that they are scrap steel in the ordinary sense of the term, do not by virtue of that fact alone fall within the provisions of paragraph 118. To give the rails the benefit of that paragraph and to make them dutiable thereunder they must not only be scrap steel or scrap iron, but such scrap steel or scrap iron as is "waste or refuse iron or steel, fit only to be remanufactured by melting." The burden was on the importer to show not only that the classification to which he objected was erroneous, but that the classification which he claimed in his protest was correct. Fisk *v.* Seeberger (38 Fed. Rep., 718–719), Walker *v.* Seeberger (38 Fed. Rep., 724, 726), Strakosh *v.* United States (1 Ct. Cust. Appls., 360; T. D. 31453), *In re* Herter Bros. (53 Fed. Rep., 913), Davies *v.* Arthur (7 Fed. Cas., 43). To sustain his protest it was not enough to show that the wares which he imported were old, worn, rusty, broken steel rails of varying lengths or that they had been discarded as unfit for their original or any similar purpose or even that they were unfit for any use in their imported condition without further manufacture. If he wished to bring the importation within the meaning of the paragraph under which he claimed it was properly dutiable, it was incumbent on him to go further than all that and to establish by a preponderance of evidence that the scrap steel rails were waste or refuse steel fit only to be *remanufactured by melting.* We think that the evidence contained in the record falls short of showing that the shipment was of that character. The fact that the rails were purchased from the Provincial Steel Co. of Canada, which bought rails fit for rerolling and sold those unfit for that purpose, can hardly be regarded as proof that the rails sold by it to the appellant were actually unfit for rerolling and much less as proof that they were fit only to be *remanufactured by melting.* True, the importer does positively testify that the wares were fit for melting purposes only. As to that fact, however, we are not satisfied from the record that he was a witness qualified to speak. It appears from his testimony that he is engaged in the business of buying and selling iron and steel of all kinds, but it does not appear that he is a manufacturer of steel or that his experience or the nature of his business is such as to give him a knowledge of all the manufacturing uses for which scrap steel rails are commercially available. Moreover, the following evidence which he gave would seem to indicate that he was uncertain as to whether the rails or some of them might not be fit for rerolling:.

Q. Take the pieces only 4 feet in length, could they be rerolled into bars?—A. *I don't know. We usually sell them over 5 feet for rerolling.*

\*          \*          \*          \*          \*          \*          \*

Q. Do you ever sell to mills that do heat and reroll as distinguished from remelting?—A. Yes, sir.

Q. From your knowledge are you able to state whether or not this particular material is unsuitable for such use?—A. I should say they are not suitable for such use.

Q. Why?—A. Because they were split heads, broken heads, and short lengths.

Q. That wouldn't prevent them from being reheated and redrawn?—A. Yes, sir.

Q. Why?—A. They have to have a rail that is almost perfect for rerolling; *it would depend a good deal on what rerolling purpose they were to be used for.*

\*     \*     \*     \*     \*     \*     \*

Q. There isn't any piece of scrap iron that could not be made over into something by spending a lot of labor on it?—A. Yes, sir; almost any scrap iron can be used for rerolling purposes.

Q. Horseshoes, nuts, and bolts?—A. Yes, sir; and spikes or anything of that kind can be rerolled.

Furthermore, his testimony to the point that the importation was fit only for remelting is somewhat weakened by the testimony of two of his witnesses, Frank Lehanan and Jedo Gould. One of them is apparently engaged in the same line of business as the appellant and the other is a manufacturer of castings and a remelter. These witnesses seemingly have had as much experience in the steel and iron business as the importer. So far as the record discloses, their opportunity for knowing whether the rails were fit commercially for one manufacturing use or another was as good as that of the importer. Yet neither of them confirmed him, and both of them expressly declined to state that the rails were unfit for any manufacturing purpose other than that of remelting. One witness, Edwin G. Taylor, did corroborate the importer in this particular. Mr. Taylor's testimony, however, was limited to the 4-foot rails purchased by the Snow Steam Pump Works and is open to the objection that his knowledge and experience of manufacturing scrap, waste, or refuse steel is not shown to extend beyond that of melting. Whether he knew anything about heating and rolling or rerolling such steel or the commercial practicability of heating and hammering it into tools does not appear. His general experience may have been such as to make him conversant with all the methods of manufacturing scrap steel and with the kinds of steel commercially suitable for each method, but we can not assume that he was so informed simply from the fact that he was a remelter, especially as the witness Gould, another remelter, stated that he was not familiar with rolling mills or rolling-mill plants and that he could not say whether there was anything about the rails which would unfit them for further manufacture by heating and rerolling without remelting.

As scrap-steel rails may be remanufactured without melting by heating and rerolling or by heating and hammering, the testimony of witnesses acquainted with those processes of remanufacturing scrap steel should have been produced to show that the rails imported were commercially unfit for such methods of manufacture. Testimony of that kind not having been produced it must be held that the appellant

has failed to sustain his protest by competent evidence showing the unfitness of his wares for any other purpose than remanufacture by melting.

Whether the rails are classifiable as waste not specially provided for under paragraph 479, or as old junk under paragraph 600, it is unnecessary to decide. That issue was not raised by the protest, and to the claims of the protest the importer must be confined in a proceeding to recover duties which he alleges have been unlawfully imposed and exacted. Davies v. Arthur (7 Fed. Cas., 43; affirmed in 96 U. S., 148).

Neither can the importer be permitted to amend his protest after the time provided by law for making it has expired. *In re* Sherman (49 Fed. Rep., 224; affirmed in 55 Fed. Rep., 276).

The decision of the Board of General Appraisers is *affirmed*.