UNITED STATES v. WEIGERT-DAGEN, WEIGERT-DAGEN SHOE CO., J. F. GOLDKAMP & CO. (No. 4664)[1]

[1] C. A. D. 464.

United States Court of Customs and Patent Appeals, June 26, 1951

*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett* and *Joseph F. Donohue,* special attorneys, of counsel), for the United States.
*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This appeal involves 18 protests which have been consolidated for the purposes of review.

The merchandise was imported from Mexico and was assessed with duty at the rate of 20 per centum ad valorem by the collector under paragraph 1530 (e) of the Tariff Act of 1930, the pertinent portion of which reads as follows:

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; * * *

Appellees filed protests against the collector's action in assessing duty as aforementioned on certain "leather Huaraches" and claimed the merchandise to be properly dutiable at the rate of 10 per centum ad valorem under the same paragraph in accordance with the Trade Agreement with Mexico reported in T. D. 50797.

As modified by the Trade Agreement, paragraph 1530 (e), *supra*, reads as follows:

1530 (e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:

    Huaraches_____10% ad valorem
    Slippers (for housewear)_____10% ad valorem

1530 (e) Men's, youths', and boys' boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for (except turn or turned, or sewed or stitched by the process or method known as McKay, or made by the process or method known as welt)_____10% ad valorem

The United States Customs Court, First Division, sustained the protests as to Exhibits 2 to 15, inclusive, 17 to 20, inclusive, 22, 23, 25, 27, 28, 30, 32, 33, 34, 36, 37, 38, 39, 44, 45, and 46, which it held to be huaraches and Exhibits 1, 40, 41, 42, and 43, which it held to be slippers (for housewear).

It sustained all the protests as to all invoice descriptions appearing in schedule "A," which was appended to the decision.

Such schedule "A," attached to and made a part of this decision, identifies the enumerated exhibits with the item numbers or invoice descriptions represented thereby in the case of merchandise as to which the protest claims were sustained. It has been established that wherever in the invoices covered by the entries in the protests at bar each such item number or invoice description appears, it always identifies the same style. Consequently, the item numbers and/or invoice descriptions listed in schedule "A" are applicable to all of the invoices covered by the entries involved.

From the judgment of the Customs Court the Government has appealed here.

When the protests were called for trial, counsel for appellees offered motions to amend protests 120694–K, 120695–K, 122689–K, and

126181–K, "by adding after the word 'Huaraches' the words 'and/or slippers (for housewear)'."

The motions to amend were opposed by counsel for the Government on the ground that the original protests were directed to "certain leather Huaraches" and that the proposed amendments involved new items of merchandise not covered by the original protest. The Customs Court granted the motions to amend the protests and this action of the Customs Court is assigned as one of the errors in this appeal.

Section 514 of the Tariff Act of 1930, relating to the filing of protests, provides:

> * * * all decisions of the collector * * * shall, upon the expiration of sixty days after the date of such liquidation, reliquidation, decision, or refusal, be final and conclusive upon all persons (including the United States and any officer thereof), unless the importer, consignee, or agent of the person paying such charge or exaction, or filing such claim for drawback, or seeking such entry or delivery, shall, within sixty days after, but not before such liquidation, reliquidation, decision, or refusal, as the case may be, * * * file a protest in writing with the collector setting forth distinctly and specifically, and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto. The reliquidation of an entry shall not open such entry so that a protest may be filed against the decision of the collector upon any question not involved in such reliquidation.

A protest under section 514, *supra*, may be amended to include a new claim regarding the same items of merchandise covered by the original protest, but, a motion to amend, introducing new merchandise for the first time constitutes a new protest and as such is untimely after the expiration of the 60-day period of limitation provided in section 514. *Marshall Field* v. *United States*, 20 C. C. P. A. (Customs) 225, T. D. 46037, wherein this court stated:

> The importer assigns error in the refusal of the trial court to permit amendment of its protest. The entry was liquidated by the collector on November 20, 1930, and the motion to amend was filed on March 24, 1931, a date greatly exceeding the statutory limit of 60 days fixed for filing protest under section 514 of said act.
>
> The trial court justifies its refusal to grant such motion by the citation of a uniform line of decisions of that court: *Monroe-Goldkamp Co.* v. *United States*, T. D. 41423, 49 Treas. Dec. 421; *Geo. Borgfeldt & Co.* v. *United States*, Abstract 10537, 57 Treas. Dec. 1000; *Huber Co.* v. *United States*, Abstract 13004, 58 Treas. Dec. 956.
>
> These cases held, in general, that a motion to amend a protest by the inclusion of goods not originally involved will not be allowed after the statute has run, it being assumed that by the running of the statute the importer's claims are barred as to those goods.
>
> Such, also, has been the view of this court: *Benjamin Iron & Steel Co.* v. *United States*, 2 Ct. Cust. Appls. 159, T. D. 31677; *Lloyd's Subagent* v. *United States*, 19 C. C. P. A. (Customs) 408, T. D. 45576.

Indeed, it may be a serious question whether jurisdiction would have been conferred upon the trial court had the amendment been allowed. *Akeroyd & Son* v. *United States*, 19 C. C. P. A. (Customs) 249, T. D. 45341. There was no error in the refusal of the trial court to grant this motion.

The original protests do not bring in issue the classification of any items of the imported merchandise here involved other than "certain leather Huaraches." It claimed those items, to wit: "certain leather Huaraches," were properly dutiable at the rate of 10 per centum ad valorem under paragraph 1530 (e), *supra*, as modified by the Trade Agreement with Mexico.

The original protests to the collector's classification made no claim as to "slippers (for housewear)" and the motions to amend the protests were filed after the expiration of the 60-day period of limitation.

This court in a long line of decisions has held that it was the purpose of Congress, in enacting the protest provision of the Tariff Act of 1930 (also of previous tariff acts), to simplify the procedure relating to the collection of customs duties, and that it would be sufficient if the protest distinctly and specifically set out the reasons for the objections to the collector's action so that the collector would know what was in the mind of the protestant, and, if proper, could take such action as was necessary to make corrections. The proper rule was stated in concise language by this court in *American Mail Line, Ltd.* v. *United States*, 34 C. C. P. A. (Customs) 1, C. A. D. 335, quoting from *Davies* v. *Arthur*, 96 U. S. 148, 151, as follows:

* * * the object of the requirement is to prevent a party, if he suffers the mistake or oversight to pass without notice, from taking advantage of it when it is too late to make the correction, and to compel him to disclose the grounds of his objection at the time when he makes his protest.
* * * Technical precision is not required; but the objections must be so distinct and specific, as, when fairly construed, to show that the objection taken at the trial was at the time in the mind of the importer, * * *.

It seems clear to us that the protests were to the assessment of duty on "certain leather Huaraches" and that the amendments which would add the words "and/or slippers (for housewear)" would extend the scope of the original protests by bringing in new items of merchandise not covered by the original protests.

We think the Customs Court erred in granting the motions to amend the original protests and that the collector's classification of all items except "certain leather Huaraches" became final and conclusive under section 514, *supra*.

The other issue here presented involves the meaning to be given to the word "huaraches" as used in paragraph 1530 (e) of the Trade Agreement with Mexico, *supra*.

Appellant contends that the correct definition of "huaraches" is that set out by the United States Tariff Commission on page 223 of its publication entitled:

Trade Agreement
Between the United States
and
Mexico

Digests of Trade Data with Respect to Products
On which Concessions were Granted
By the United States
Washington
1943

In the foreword it is stated:

The introduction to this volume consists of an analysis of the trade agreement between the United States and the Mexican Republic, signed December 23, 1942; a statement concerning the economy of Mexico; and data relating to trade between the two countries.

Following the introduction are digests of information concerning products on which concessions were granted by the United States in the trade agreement with the Mexican Republic. *The material presented has been drawn from the detailed data made available by the United States Tariff Commission, prior to and during the negotiations with Mexico, to the Trade Agreements Committee,* which is the inter-departmental body charged with carrying out the trade-agreements program. Practically all of this information was gathered by the Tariff Commission in compliance with that part of Senate Resolution 334, 72d Congress, 2d Session, which called for a revision of summaries of tariff information previously compiled by the Commission. * * * [Italics supplied.]

The definition of "huaraches" appears under the heading "Description and Uses," and is as follows:

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

On page 225 of the Digests of Trade Data concerning the Trade Agreement with Mexico, *supra,* "huaraches" are referred to as sandals in the paragraph reading as follows:

The production of huaraches has long been a handicraft industry in Mexico. In most localities they are made only in sufficient quantities to fill local needs, but since these *sandals* have become popular in the United States, a number of sections have increased their output substantially in order to meet the export demand. * * * [Italics ours.]

The Customs Court held that no commercial designation of the term "huaraches" had been proved which differed from its common meaning, and that both its common and commercial meaning in the United States at the time of the negotiation of the Mexican Trade Agreement were understood to refer to a type of footwear generally

worn in Mexico and having as its distinguishing feature a woven upper laced to the insole, the latter being generally, but not necessarily, machine stitched to the outsole.

The Customs Court, relying on the testimony of appellee's witnesses, was not of the opinion that the term "woven upper" necessarily meant a wholly woven upper. The witnesses had testified that a "woven upper" included one which did not consist wholly of strips of leather but comprised partly a slitted solid piece of leather through which leather strips had been woven, the latter being laced through slots in the insole. But the Customs Court did not consider as a woven upper a solid piece of leather cut in the form of a vamp and containing leather strips interwoven for decorative effect only, not being laced through slots in the insole.

The court below did recognize as huaraches a variation utilizing a unitary insole and outsole made from a split or slit piece of leather with the upper being woven through holes in the top of the split.

Both parties produced witnesses who testified regarding the merchandise at bar.

We agree with the trial court in its statement that:

Not all of the witnesses, even those called by the same party, were in agreement as to what was regarded as huaraches in the footwear trade of the United States at the time of the negotiation and promulgation of the Mexican Trade Agreement, *supra*. * * *

The Customs Court pointed out that some of plaintiff's witnesses regarded the woven upper as the only distinguishing feature of huaraches and that the method of fastening the upper to the insole by lacing was regarded as immaterial; that other witnesses for plaintiffs considered that the upper must be at least partly woven and at least partly laced to the insole in order that the article be a huarache; that witnesses for the Government distinguished huaraches from conventional footwear with woven material substituted for solid material by denominating the latter as "woven footwear" or "woven shoes" and that two of the Government's witnesses described huaraches as footwear with woven uppers which are attached to the insole by lacing through holes in the insole, the insole being fastened to the outsole by being stitched on a Goodyear machine.

We think the testimony fails to establish a definite definition for the word "huaraches" both as to its commercial and its common meaning.

We agree with the Customs Court that the word "huaraches" as found in the Trade Agreement with Mexico is an ambiguous word.

In cases where a word which is ambiguous and of doubtful meaning is used in a trade agreement it is proper for the court to resort to extraneous aids under the established rules of evidence in its effort to determine the meaning of the ambiguous and doubtful word. *United*

*States* v. *Good Neighbor Imports, Inc.*, 33 C. C. P. A. (Customs) 91, C. A. D. 321; *C. H. Powell Co.* v. *United States*, 34 C. C. P. A. (Customs) 29, C. A. D. 340.

The word "huaraches" being ambiguous and of doubtful meaning, and there being no clear common or commercial meaning established, it is proper for the court, in order to determine the meaning of the word and to give effect to the intent of the negotiators of the agreement, to consider the information contained in the Digests of Trade Data, *supra*, which was furnished to the negotiators before the negotiations and which was before them during the negotiations; and, while that information is not binding upon the court, it may be sufficient to establish the meaning of the ambiguous and doubtful word. If, in the light of all of the available evidence of the negotiators' intent, the information in the Digests of Trade Data establishes the meaning of the ambiguous word, then that meaning may be adopted by the court so as to give force and effect to the intent of the negotiators of the agreement.

Referring to the Government's contention that the Digests of Trade Data definition of huaraches should be adopted, the Customs Court stated:

\* \* \* its primary position as expressed by counsel at the various hearings and in the brief filed in its behalf is that the doctrines of interpretation of statutes, including the rules relating to the determination of the common meaning of words and/or their commercial meaning, must yield where the intent of the lawmakers clearly appears. In this case it is contended that such intent is manifested by the definition quoted above by reason of the fact that such definition was furnished to the negotiators of the Mexican Trade Agreement prior to and during the negotiations with Mexico.

\*      \*      \*      \*      \*      \*      \*

Certainly, in the case of statutory words of ambiguous or doubtful meaning, the clear indication of the legislative intent as to such words, as revealed by the history of the bill or act in which the words appear, is binding on the courts, for no rule is better settled than the one that in the interpretation of statutes the legislative intent shall be carried out. \* \* \*

By like token in the case of trade agreements where the commercial or common meaning of an ambiguous word of doubtful meaning is not satisfactorily established, the clear intent of the negotiators of the trade agreement as to the meaning of such ambiguous word, as revealed by the history of the trade agreement in which the word appears, should be carried out.

In determining what the negotiators of the Trade Agreement with Mexico had in mind it is proper for us to consider all the evidence bearing on the subject.

Agreements between nations should be construed so as to carry out the intention of the contracting parties.

The Digests of Trade Data, containing the definition of the term "huaraches," which was furnished the negotiators of the Trade

Agreement by the United States Tariff Commission prior to and during the negotiations is the only convincing evidence in the record as to the intent of the contracting parties as to the meaning of the term "huaraches."

It seems clear to us that it was the intent of the negotiators of the Trade Agreement with Mexico to provide a duty of 10 per centum ad valorem on the articles, to wit, leather huaraches, described to them by the Tariff Commission, both before and during the negotiations as follows:

*Description and uses.*
Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

It is interesting to note that Mr. Weigert, president of the Weigert-Dagen Shoe Company, one of the appellees in the case at bar, testified that he was an importer of shoes; that he has been to Mexico repeatedly and was there approximately three weeks in 1940; approximately six to eight weeks in 1941, 1944, and 1945; approximately eight to ten weeks in each of 1942 and 1943; and about three months in 1946; that he visited the markets where he purchased merchandise like that here involved from homeworkers and from factories.

The following questions and answers seem significantly pertinent:

XQ. Now, when you speak of "home workers," what type of manufacturers are they? Will you describe them more fully? What do you mean by "home workers"?
A. You enter a home and some part of the home is furniture-less, and you will find in this part women and men sitting on the floor and weaving these, what was call [sic] vamps, in the trade, the uppers of this footwear. In another part of the home there may be a room given over to perhaps one machine which takes care of the stitching, and in some other corner of the same home a piece of iron is mounted over which the heels are attached. The family of these people live in some other part of the home, and that's why I call it a home.

      *       *       *       *       *       *       *

XQ. Will you explain, Mr. Weigert, what you mean by a factory in Mexico?
A. A factory in Mexico is still very often not a factory building but a home which either partly or entirely has been converted for the manufacturing of this type of footwear.

It will be noted that the steps in making the footwear which were described by Mr. Weigert fit the Trade Digest Data description of a huarache.

We do not think Exhibits 2 to 15, 17 to 20, 22, 23, 25, 27, 28, 30, 32, 33, 34, 36 to 39, and 44 to 46, all inclusive, are huaraches within the meaning of paragraph 1530 (e), *supra*, as amended by the Trade Agreement with Mexico, and accordingly the judgment of the Customs Court with respect to those exhibits is *reversed*.

For the reasons stated hereinbefore we are of the opinion that the amendments to the protests should not have been allowed and consequently the judgment of the Customs Court in so far as it relates to Exhibits 1, 40, 41, 42, and 43 is also *reversed*.

SCHEDULE "A"

| Exhibit No. | Invoice Description or Item No. |
|---|---|
| 1 | Michito (except items of this description appearing on invoices covered by protests 126836–K and 121021–K) |
| 2 | 84–A |
| 3 | Selectita |
| 4 | 55 |
| 5 | 9876–P, Women's Roman |
| 6 | Roman Perf., 9876, Women's Roman |
| 7 | Aztecita |
| 8 | Mazatlan |
| 9 | Zochil |
| 10 | Roman Nino |
| 11 | 1479, Women's Monk |
| 12 | Model 800, Multicolor |
| 13 | Selecta |
| 14 | Selectita |
| 15 | Mazatlan |
| 17 | 3–W Natural |
| 18 | Chapala |
| 19 | Model 900, Multicolor |
| 20 | Pachuco |
| 22 | Princesita |
| 23 | Zochil |
| 25 | Aztec |
| 27 | Curiosita |
| 28 | Corita |
| 30 | Militar |
| 32 | 5231, Peineton |
| 33 | Cora |
| 34 | Potro Ojillado para Mujer |
| 36 | Potro |
| 37 | Picadito |
| 38 | Picado |
| 39 | Especial |
| 40 | Cocori |
| 41 | 3058 |
| 42 | 3052 |
| 43 | Antina |
| 44 | S–61–091 |
| 45 | S–61–166, M61–105 |
| 46 | M61–107 |

O'CONNELL, Judge, dissenting.

It is my firm conviction that the judgment appealed from should be affirmed for the reasons stated in the opinion of Judge Mollison, speaking for all of the participating judges, in the trial of the case in the Customs Court.